1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    CURTIS WAYNE TRAVIS,                    Case No.  1:16-cv-01080-LJO-JDP (HC)

12                 Petitioner,                FINDINGS AND RECOMMENDATIONS TO
                                              DENY PETITION FOR WRIT OF HABEAS
13         v.                                 CORPUS

14    JOE A. LIZARRAGA,                       ECF No. 1

15                 Respondent.                OBJECTIONS DUE IN 14 DAYS

16

17         Petitioner Curtis Wayne Travis, a state prisoner without counsel, seeks a writ of habeas

18   corpus under 28 U.S.C. § 2254.  He raises eight habeas claims, including ineffective assistance of

19   counsel, insufficient evidence, and errors in jury instructions.  We recommend that the court deny

20   the petition.

21   **I.     Background**

22         This is a felony murder case.  According to the government, petitioner and his accomplice

23   committed a home invasion robbery and stole a truck.  As petitioner fled the scene of the crime,

24   the stolen truck collided with another vehicle, killing an occupant of that vehicle.  Petitioner's

25   principal defense at trial was that he was not the driver of the stolen truck.  He did not prevail,

26   and a jury convicted petitioner of one count of first-degree felony murder with robbery special

27   circumstance, one count of first-degree residential robbery, one count of vehicle theft, and one

28   count of leaving the scene of an accident involving death.  *See* Cal. Penal Code §§ 187(a), 189,

190.2(a)(17)(A), 211, 212.5(a); Cal. Veh. Code §§ 10851(a), 20001(a); CT 4:807-13.[1]  The Superior Court of Fresno County sentenced petitioner to life in prison without the possibility of parole.  On direct appeal, the California Court of Appeal, Fifth District ("Court of Appeal") affirmed.  The California Supreme Court summarily denied review.

We set forth below the facts of the underlying offenses, as stated by the Court of Appeal.  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> In the early morning hours of January 5, 2011, two people broke into an apartment located at 4111 North Blythe Avenue in Fresno.  The residents of the apartment, David Ruiz and his wife, Sylvia Gutierrez, awoke to the sound of a window breaking and were soon accosted by two men.  The intruders made specific demands for cash, cell phones, a laptop computer, and the keys to Mr. Ruiz's pickup truck.  Upon obtaining these items, the robbers left the home and drove away in the victim's truck.

> After checking on the welfare of his family, Mr. Ruiz used a neighbor's telephone to call 911.  It was 1:08 a.m. when he reported the robbery.  Meanwhile, police were already being dispatched to the scene of a motor vehicle collision approximately half a mile away from Mr. Ruiz's apartment, near the Highway 99 off-ramp at the intersection of Ashlan Avenue and Golden State Boulevard.  A bystander reported the accident at approximately 1:06 a.m.

> The traffic accident involved a collision between a Chevrolet Silverado pickup truck and a Ford Taurus sedan.  Eyewitnesses reported seeing two men exit the truck and leave the vicinity of the crash on foot.  The driver of the Ford Taurus was pronounced dead at the scene.  It was later determined that the truck belonged to David Ruiz, and police eventually arrested Curtis Travis and Stephen Stowers in connection with the robbery and the vehicular homicide.

> . . .

> **Prosecution Case**

> David Ruiz and Sylvia Gutierrez testified to their respective recollections of the robbery.  Both claimed that a "light-skinned" man and a "dark-skinned" man broke into their apartment on the night in question.  The men were dressed in dark clothing and had facial garments which covered at least the "lower part of the jawbone."  Mr. Ruiz identified Travis in court as the light-skinned robber, recalling that as between him and his accomplice, Travis

---

[1] All "CT" citations refer to the clerk's transcript.  All "RT" citations refer to the reporter's transcript.  Respondent has lodged these documents with this court.  *See* ECF No. 19.

was the one who did most of the talking. Travis communicated with Mr. Ruiz in English, with the exception of his attempt to make some kind of gang reference in poorly spoken Spanish.

Mr. Ruiz was told to hand over the keys to his pickup truck, which was then parked just a few feet away from the front door to his apartment. He later heard the truck being started up and driven away after the robbers left his home. Once they were gone, Mr. Ruiz checked on his sleeping children before contacting the police. His trial testimony indicated that the crime was promptly reported. However, it was revealed on cross-examination that Mr. Ruiz had previously testified (at a preliminary hearing) that approximately "five to eight minutes" elapsed between the time the robbers departed from his home and his initiation of the 911 call.

Michael Harkness provided an eyewitness account of the motor vehicle collision. While driving home from work at approximately 1:00 a.m., Mr. Harkness took the Ashlan Avenue exit from northbound Highway 99 and entered the far right lane of the three-lane off-ramp. He stopped for a red light at the end of the ramp and waited to turn right on to eastbound Ashlan Avenue. The weather conditions were "really foggy," but he could see a white car in the far left lane which appeared to be waiting to turn on to westbound Ashlan Avenue. When the light turned green, Mr. Harkness looked both ways and prepared to make his turn when suddenly he heard a loud noise and saw a truck in the eastbound lane of Ashlan Avenue collide with the white car in the middle of the intersection.

The force of the collision pushed the white car eastward into the path of Mr. Harkness's vehicle and caused the truck to spin around such that it came to rest in the middle of the intersection with its front end facing west. Mr. Harkness saw two men emerge from opposite sides of the truck and noticed that the driver was covering his face with his hand and forearm. Mr. Harkness got out of his vehicle and asked the men if they were okay, but they waved him off and disappeared from the scene after he turned around to check on the other driver.

The driver of the white car was a 50–year–old man named Heliodoro Ruvalcaba. Testimony from Dr. Venu Gopal of the Fresno County Coroner's Office established that Mr. Ruvalcaba died immediately from head and chest injuries sustained during the crash. Toxicology results were negative for the presence of alcohol or illegal drugs at the time of death.

Detective Brian Hance of the Fresno Police Department's Traffic Bureau conducted an investigation into the collision, which included a visual inspection of the scene and other accident reconstruction efforts. His testimony described the conditions on the night of the incident as "very foggy, very cold, [and] wet," with visibility of approximately 300 feet. The intersection where the collision occurred was controlled by traffic lights, and they appeared to be working properly. Detective Hance determined that the pickup truck was travelling at approximately 57.9 miles per hour when it collided with Mr. Ruvalcaba's car, exceeding the 45

3

miles per hour speed limit for that section of Ashlan Avenue.

Mr. Ruiz's truck sustained extensive front-end collision damage. The rear and driver's side windows were shattered, and interior damage to the windshield led Detective Hance to conclude that two people were in the vehicle at the time of the crash. He assumed both occupants exited through the broken driver's side window, but made no attempt to open the doors of the truck during his investigation.

Jacquez Narvaez, who lived in the same apartment complex as Mr. Ruiz, testified to his knowledge of Travis' and Stowers' whereabouts prior to the robbery. Narvaez claimed both men were at his apartment on the evening of January 4, 2011 and into the early part of the next day, drinking liquor and smoking marijuana with him and another individual named Trennell. Travis eventually told the group that he knew of a place where they could "get some stuff" and asked if anyone wanted to go with him to the unspecified location. Narvaez and Trennell passed on the offer, but Stowers was apparently interested; he and Travis soon departed from Narvaez's apartment together while the other two men stayed behind. Narvaez was initially reluctant to share this information with the authorities, and actually gave false information to police during the early stages of their investigation, but he later called in a tip to the Crime Stoppers hotline which led to the defendants' arrest.

Detective Manuel Romero provided testimony regarding statements made to him by Travis and Stowers during custodial interviews. Stowers admitted to participating in the robbery and being involved in the fatal car crash. He claimed that he was sitting in the passenger seat of Mr. Ruiz's truck when the collision occurred. The driver of the truck had been speeding, and Stowers asked him to stop the vehicle and let him out, but his requests were ignored.

Travis told police that he had no involvement in any of the crimes, and denied that he had ever visited the apartment complex where Mr. Ruiz lived or been inside of his pickup truck. The latter denial was proven false by DNA evidence, which was presented to the jury through the testimony of Scott Lewis, a criminalist at the Department of Justice laboratory in Fresno. Travis' DNA was matched to blood samples found on the exterior driver's side door handle of the truck; in a location to the right of the driver's side door on the exterior of the vehicle; on the interior armrest of the driver's side door; and on the interior windshield in a location slightly right of the rearview mirror. Stowers' DNA was matched to blood samples found on the interior passenger's side door and windshield.

**Defense Case**

Travis took the stand in his own defense. He acknowledged multiple prior felony convictions for theft-related offenses, and his former membership in the Bulldogs street gang. Travis also admitted that he lied to police about where he had been on the night

of the robbery.

Travis testified that he spent the evening at Jacquez Narvaez's apartment drinking whiskey and smoking marijuana with Narvaez and two black males, one of whom was Stowers. The other black man did not identify himself. Once they finished drinking their bottle of liquor, Travis left the apartment and began to walk home. Within approximately five minutes of his departure, Stowers and the unidentified black man drove up to him in a pickup truck and asked Travis if he knew of anyone who wanted to buy cell phones and a laptop computer. Travis replied that his brother-in-law would likely be interested in the items, and agreed to go with them to meet up with the potential buyer. Travis climbed into the back of the truck's cabin and sat behind Stowers, who was located in the front passenger seat. The driver of the truck collided with a vehicle on Ashlan Avenue approximately one minute later.

Accounting for the presence of his DNA, Travis explained that he was thrown forward as a result of the collision and sustained cuts on his left hand and the inside of his mouth. He later climbed over the front seat and attempted to exit the vehicle by opening the driver's side door, first trying the inside handle and then reaching through the broken window to use the exterior handle, but found that the door was stuck. He crawled out through the driver's side window and then proceeded to walk home.

Mark Whelchel, a retained expert in the field of accident reconstruction and occupant kinematics, testified to the plausibility of Travis' story. Mr. Whelchel was of the opinion that there were three people inside of Mr. Ruiz's truck when the accident occurred. He further opined that the blood sample found to the right of the rearview mirror on the interior windshield (which was matched to Travis through DNA testing) did not come from the person who was driving the vehicle.

Other defense witnesses included Mitchell Eisen, Ph.D., a self-described memory expert whose testimony was intended to challenge the reliability of David Ruiz's identifications of Travis during a photographic lineup and again at trial, and Michael White, a police officer who had spoken to witness Michael Harkness at the scene of the car crash. According to Officer White, Mr. Harkness reported seeing two black males exit from the truck that was involved in the collision (Mr. Harkness refuted this allegation during the prosecution's case-in-chief). The defense also played an audio recording of a 911 call made by Isaias Rodriguez, i.e., the bystander who initially reported the accident. The caller said that he had observed two black males walking away from the scene.

Travis' final witness was a private investigator named Ken Watkins. Mr. Watkins had attempted to recreate the drive from Mr. Ruiz's apartment complex to the scene of the fatal collision for purposes of establishing possible distances and travel times between the two locations. The investigator identified two possible routes, and drove each of them twice at an approximate speed of 35 to 40 miles per hour. According to his trial testimony, the first

route covered a distance of 0.6 miles, which he traversed in two minutes and 45 seconds on the first attempt and two minutes and 50 seconds on the second. The alternate route was first measured at 0.9 miles and later at exactly one mile, with identical driving times of two minutes and 55 seconds.

*People v. Travis*, No. F066423, 2015 WL 390361, at *1-4 (Cal. Ct. App. Jan. 29, 2015).

## II.    Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). In deciding a Section 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have

supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018)

(quoting *Richter*, 562 U.S. at 102). On all issues decided on the merits, the petitioner must show

that the state court's decision is "so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,

562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a

Section 2254 petitioner must satisfy a demanding standard to obtain habeas relief. When a state

court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that

the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S.

at 99. And a federal habeas court's obligation to consider arguments or theories that could

support a state court's decision extends to state-court decisions that offer no reasoning at all. *See*

*Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then

Section 2254(d)'s deferential standard does not apply, *see Visciotti v. Martel*, 862 F.3d 749, 760

(9th Cir. 2016), but the petitioner faces another hurdle: if the state court's decision relies on a

state procedural rule that is "firmly established and regularly followed," the petitioner has

procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he

shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct.

1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the

petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal

for failure to exhaust state-court remedies. *See Murray*, 882 F.3d at 807.

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to

be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs

the State's significant interest in repose for concluded litigation, denies society the right to punish

some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises

of federal judicial authority." *Id.* at 103 (citation omitted). Our habeas review authority serves as

a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for

ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

Here, petitioner raises eight habeas claims:

1. The state trial court precluded petitioner from pursuing a defense under California's escape rule.

2. The state trial court failed to instruct the jury on the escape rule.

3. The state trial court failed to provide proper jury instructions on proximate cause.

4. The state trial court erroneously used the term "driver" as a synonym for the term "perpetrator" in jury instructions.

5. Petitioner received ineffective assistance of counsel because his trial counsel failed to request proper jury instructions on the escape rule and proximate cause.

6. The state trial court's jury instructions on conflicting evidence relieved the government of its burden of proof.

7. The state trial court failed to define the term "actual killer" in the jury instructions.

8. The jury had insufficient evidence to find that petitioner was the driver of the stolen truck.

Because the Court of Appeal was the last state court to issue a reasoned opinion on petitioner's habeas claims, we review the Court of Appeal's decision. The Court of Appeal rejected all claims on the merits, so we apply the AEDPA's deferential standards for all claims.

**a. Escape Rule (Claims 1 and 2)**

Petitioner's first two habeas claims pertain to California's escape rule, which defines the "outer limits of the 'continuous-transaction' theory." *People v. Wilkins*, 56 Cal. 4th 333, 345 (2013). Under the continuous-transaction doctrine, a criminal defendant may be guilty of felony murder if a "felony and the act resulting in death constitute one continuous transaction." *Id*. at 342. The escape rule provides that the criminal transaction continues until "the felon has not reached a place of temporary safety." *Id*. at 345. According to petitioner, he is not guilty of felony murder because, by the time the stolen truck collided with the deceased victim's car, he had already reached a place of temporary safety: he had left the scene of the crime and no one was chasing him. Petitioner failed to raise his escape-rule defense at trial, but he faults the state trial court for this failure. He claims that a trial court "ruling" precluded him from pursuing his

8

escape-rule defense, in violation of his constitutional right to present a defense (Claim 1). Alternatively, he claims that the trial court failed to instruct the jury on the escape rule *sua sponte*, in violation of his constitutional right to due process (Claim 2).

As a preliminary matter, the trial court never precluded petitioner from raising his escape-rule defense. At trial, the court had a brief recess to discuss certain issues pertaining to the verdict forms after the government's closing argument. The trial court then made the following remarks, which petitioner mischaracterizes as the court's "ruling":

> THE COURT: [CALCRIM No.] 730 reads, "Defendant is charged with a special circumstance of murder committed while engaged in the commission of," and then the blank for the term robbery, and that's the language that—that the instruction uses, and it does not refer to immediate flight from the robbery.
>
> I would concede that that is a more specific allegation, and it is in the statute, but it's not in the pattern instruction. For that reason I've prepared the instruction consistent with the CALCRIM pattern.
>
> It should be clear that – *I don't think that anybody can argue that this was not immediate flight after the robbery*, and certainly the statute seems to suggest that whether it was in the commission of the robbery or immediate flight after the robbery, the special circumstance would apply. So I guess my point here is I was gonna make the verdict form consistent with the language in the instruction, but *I am going to let counsel argue* that immediate flight after commission of the crime of the robbery is in fact part of the commission of the robbery, and then I think counsel has to point to 549 as to how those factors support that conclusion, but I don't think it would be appropriate for anyone to say that the robbery was concluded when the parties had not reached a place of temporary safety under any construction of the evidence. . . . Want to be heard on that, Mr. Wright?
>
> MR. WRIGHT [Prosecutor]: No . . .
>
> THE COURT: Mr. Green?
>
> MR. GREEN [Stowers' counsel]: No.
>
> THE COURT: Mr. Drandell?
>
> MR. DRANDELL [Petitioner's counsel]: *Submit*.
>
> THE COURT: All right.

RT 8:2139-41 (emphasis added). The trial judge's remarks indicated that he would make the verdict form consistent with the statute and that the parties were free to argue that the fatal

9

collision did not occur during the immediate flight after the robbery, even though the judge did not anticipate such an argument. The remarks did not constitute a ruling that precluded petitioner from raising any defense.[2]

Petitioner may have procedurally defaulted on his escape-rule claims by failing to raise them at trial, but the claims fail for a more fundamental reason. The evidence overwhelmingly showed that the deceased victim died during the immediate flight after the robbery, so petitioner could not have prevailed on his escape-rule defense. Because the alleged errors were harmless, the Court of Appeal reasonably rejected petitioner's escape-rule claims.

The standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), governs our harmless-error inquiry. *See Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014) (per curiam). Under *Brecht,* a petitioner can obtain federal habeas relief only if "the error had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637. To satisfy this standard, the court must have "grave doubt" as to the outcome, meaning that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Here, we do not have such grave doubt. The collision that killed the victim occurred about eight minutes after the robbery and within one mile of the scene of the crime. RT 3:741; RT 4:959-61; RT 7:1905. Petitioner drove the stolen truck fast enough to kill the victim immediately upon impact. RT 4:1010-12. He ran a red light. RT 3:628-630. And after the serious collision, petitioner disappeared from the scene—abandoning the injured passenger in the other car. RT 3:631-32. Petitioner himself was injured, but he left the scene immediately, waving off a bystander who had asked whether he was okay. RT 3:631. These facts strongly support the finding that petitioner was fleeing a crime scene. Although petitioner states that he had left the crime scene and that no one was chasing him, those facts did not preclude the finding

---

[2] In addition, we found no precedent that requires the trial court to give a jury instruction that the parties have conceded to be unnecessary. The Constitution does not impose on trial courts a *sua sponte* duty to instruct every potential defense. *See Boyer v. Chappell*, 793 F.3d 1092, 1107 (9th Cir. 2015). Under California law, a trial court's *sua sponte* duty to instruct on general principles of law and potential theories of the case is limited to those relevant to the issues raised and supported by substantial evidence. *See People v. Young*, 34 Cal. 4th 1149, 1200 (2005).

that he was on the run.  *See People v. Russell*, 187 Cal. App. 4th 981, 991 (2010) (noting that a felon located thirty minutes away from the robbery scene was in flight and that "it is not necessary to show the felon was either chased from the scene or that without the felon's knowledge police had been called").

In sum, the alleged errors were harmless because petitioner could not prevail on his escape-rule defense.  The Court of Appeal reasonably rejected petitioner's claims that that the trial court unlawfully precluded him from pursuing his escape-rule defense and that the trial court failed to provide jury instructions on the escape rule.

### b.  Jury Instructions (Claims 3, 4, 6, 7)

A jury instruction can violate the Constitution's due process guarantee if it relieves the government of its obligation to "prove every element of the offense" beyond a reasonable doubt.  *See Dixon v. Williams*, 750 F.3d 1027, 1032 (9th Cir. 2014).  An instruction that correctly informs the jury of the elements of a crime under state law does not violate federal law.  *See Spivey v. Rocha*, 194 F.3d 971, 976 (9th Cir. 1999).  And "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  *Dixon*, 750 F.3d at 1032 (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)).  The challenged jury instruction must have "so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

### i.  Failure to Instruct on Proximate Cause (Claim 3)

The state trial court used CALCRIM No. 540A to instruct the jury on the prima facie elements of felony murder.  Here are the pertinent portions of the jury instruction:

> Each defendant is charged in Count 1 with murder, under a theory of felony murder.  This instruction applies to a defendant if you find that *he was the driver of the vehicle* that collided with the vehicle driven by Heliodoro Ruvalcaba.
>
> To prove a defendant guilty of first degree murder under this theory, the People must prove that:
>
> > 1. The defendant committed robbery;
> >
> > 2. The defendant intended to commit robbery; AND
> >
> > 3. *While committing robbery the defendant caused the death of*

1                 *another person.*

2            A person may be guilty of felony murder even if the killing was
unintentional, accidental, or negligent.

3

4            To decide whether the defendant committed robbery, please refer to
the separate instructions that I will give you on that crime. You
must apply those instructions when you decide whether the People

5            have proved first degree murder under a theory of felony murder.

6            The defendant must have intended to commit the robbery before or
at the time that he caused the death.

7

8            It is not required that the person die immediately, as long as the
cause of death and the robbery are part of one continuous
transaction. The term '*one continuous transaction*' is more fully

9            described in instruction number 549, which follows.

10 CT 4:725-26 (emphasis added). The court then instructed the jury on the doctrine of the

11 continuous transaction, using CALCRIM No. 549:

12            In deciding whether the act causing the death and the robbery were
part of one continuous transaction, you may consider the following

13            factors:

14                1. Whether the robbery and the fatal act occurred at the
same place;

15

16                2. The time period, if any, between the robbery and the fatal
act;

17                3. Whether the fatal act was committed for the purpose of
aiding the commission of the robbery or escape after the

18                robbery;

19                4. Whether the fatal act occurred while the perpetrator was
fleeing from the scene of the robbery or otherwise trying to

20                prevent the discovery or reporting of the crime;

21                5. Whether the robbery was the direct cause of the death;
AND

22

23                6. Whether the death was a natural and probable
consequence of the robbery.

24 CT 4:729-30. Petitioner had no issue with these jury instructions at trial and did not propose an

25 alternative instruction. He now contends that the trial court failed to give proper instructions on

26 proximate cause. According to petitioner, the trial court should have used CALCRIM No. 540C,

27 not CALCRIM No. 540A. The pertinent part of CALCRIM No. 540C states:

28            An act causes death if the death is the direct, natural, and probable

consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

Judicial Council of Cal. Crim. Jury Instr. 540C (CALCRIM No. 540C).

Petitioner's argument fails for two reasons. First, the Court of Appeal concluded that, as a matter of California law, the trial court's instructions on felony murder adequately instructed the jury on the principles of proximate cause. "Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction." *Wilkins*, 56 Cal. 4th at 340. In petitioner's case, what mattered for the proximate cause element was "whether the felony has been completed, abandoned, stopped, or is ongoing." *People v. Pock*, 19 Cal. App. 4th 1263, 1276 (1993). The trial court's jury instructions sufficed because they required the jury to find that petitioner, as the driver of the stolen truck, caused the victim's death during the commission of the underlying felony; a more detailed and separate instruction on proximate cause principles was not required. *See id.*; *People v. Huynh*, 212 Cal. App. 4th 285, 311 (2012) (no requirement for jury instructions on causation principles in single-perpetrator felony-murder cases); *cf. United States v. Smith*, 831 F.3d 1207, 1216 (9th Cir. 2016) (no error when a federal district court gave a nexus instruction that accurately reflected the law and was substantively identical to the one proposed by the parties).[3] Thus, the trial court did not inappropriately relieve the government of proving the proximate cause element. Although a state-law error rising to the level of a due process violation can warrant federal habeas relief, *see Smith v. Ryan*, 823 F.3d 1270, 1282 n.8 (9th Cir. 2016), we cannot find such an error here.

Second, petitioner's proximate-cause claim depends on the premise that his crime was completed by the time the victim died from the collision. He contends that the robbery and the

---

[3] In addition, the commentary for CALCRIM No. 540C provides that the proposed instruction "should be used *only when* the alleged victim dies during the course of the felony as a result of a *heart attack, fire, or a similar cause* . . . ." Judicial Council of Cal. Crim. Jury Instr. 540C (CALCRIM No. 540C) (emphasis added).

13

fatal accident were separate events. He repeats the argument that he advances in support of his

escape-rule defense: that he was away from the crime scene and no one was chasing him. But as

discussed above, the argument lacks merit. The collision occurred during the pendency of the

underlying offenses.

### ii. Using the Word "Driver" Instead of the Word "Perpetrator" (Claim 4)

The trial court used the word "driver" as a synonym for the word "perpetrator" in several

jury instructions. For example, the trial court said, "Each defendant is charged in Count 1 with

murder, under a theory of felony murder. This instruction applies to a defendant if you find that

he was the *driver of the vehicle* that collided with the vehicle driven by Heliodoro Ruvalcalba."

CT 4:725-28 (emphasis added). Petitioner argues:

> These instructions identified the "driver of the vehicle that collided
> with the vehicle driven by Heliodoro Ruvalcalba" as the
> "perpetrator" of felony murder, with the "perpetrator" being defined
> as the person who "did the act that resulted in the death." This
> language included an improper assumption of fact, *i.e.*, that the
> "driver of the vehicle that collided with the vehicle driven by
> Heliodoro Ruvalcalba" was the "killer," who actually "did the act
> that resulted in the death."
>
> By treating those facts as given, the instruction invaded the
> province of the jury. It had the effect of removing the question of
> causation — *i.e.*, whether or not the driver of the pickup was
> responsible for the collision that killed Ruvalcalba — from the
> jury's consideration by directing the jury to assume that the
> "driver" of the stolen vehicle was the perpetrator or actual killer.
> That assumption treats the issue of causation as a given, which
> tends to remove that issue the jury's consideration. The jury is not
> given the opportunity to decide whether or not the prior robbery
> was a substantial factor in causing the fatal collision. Nor is the
> jury given the opportunity to decide whether Ruvalcalba could have
> been at fault in causing the accident himself.

ECF No. 1 at 35-36.

The Court of Appeal reasonably rejected this claim. The jury decided whether petitioner

proximately caused the victim's death in response to the jury instructions discussed above,

including those on the continuous transaction doctrine and felony murder, which encompassed the

pertinent causation principles. Petitioner's apparent speculation that the victim might have been

at fault for his own death by causing the accident is equally meritless. He adduces no evidence in

support, and a victim's negligence is a "normal and reasonably foreseeable result" under

14

California law that does not exonerate criminal liability. *See People v. Morse*, 2 Cal. App. 4th 620, 639 (1992).

### iii. Instructions on Conflicting Evidence (Claim 6)

The jury received these instructions on how to evaluate conflicting evidence:

> If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. *What is important is whether the testimony or any other evidence convinces you*, not just the number of witnesses who testify about a certain point.

CT 4:709 (emphasis added). These instructions come from CALCRIM No. 302, another set of pattern jury instruction commonly used in California courts. Petitioner was the one who requested that this instruction be given at trial, but he argued on appeal that it "diluted" the government's burden of proof. ECF No. 1 at 41. According to petitioner, the instruction suggested that "when there is a conflicting evidence, inculpatory evidence and exculpatory evidence are to be judged by the same standard, and that exculpatory evidence may be credited only if the jury decides to believe it and is convinced by it." ECF No. 1 at 41. The Court of Appeal rejected this claim, explaining that the same jury instructions have been upheld in California courts.

Federal courts, including this court, have rejected the argument that CALCRIM No. 302 dilutes the government's burden of proof. *See Shaffer v. Muniz*, No. 15-cv-2591, 2018 WL 3546649, at *20 (E.D. Cal. July 24, 2018), *recommendation adopted*, 2017 WL 1179237, at *1 (E.D. Cal. Mar. 30, 2017); *Johnson v. California*, No. 10-cv716, 2011 WL 3962119, at *16 (C.D. Cal. July 25, 2011), *recommendation adopted*, 2011 WL 3962115 (C.D. Cal. Sept. 1, 2011). Petitioner's claim relies on a misreading of CALCRIM No. 302. The instruction did not require the jury to credit any exculpatory evidence in order to acquit. The trial court also instructed the jury on CALCRIM No. 100, which explained that petitioner had no obligation to prove his innocence. *See* CT 4:680 ("Because they are presumed innocent, the defendants do not have to prove that they are not guilty."). CALCRIM No. 302, read individually or together with

15

CALCRIM No. 100, did not dilute the government's burden of proof. The Court of Appeal reasonably rejected petitioner's claim.

### iv. Failure to Define the Term "Actual Killer" (Claim 7)

The state trial court used CALCRIM No. 703 to instruct the jury on the intent requirement of accomplice liability. Here is the jury instruction:

> If you decide that a defendant is guilty of first degree murder but was not the *actual killer*, then, when you consider the special circumstance allegation, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.
>
> In order to prove this special circumstance for a defendant who is not the *actual killer* but who is guilty of first degree murder, the People must prove either that the defendant intended to kill, or the People must prove all of the following:
>
> 1. The defendant's participation in the crime began before or during the killing;
>
> 2. The defendant was a major participant in the crime; and
>
> 3. When the defendant participated in the crime, he acted with reckless indifference to human life.

RT 8:2124-25 (emphasis added). Petitioner contends that the trial court erred by failing to define the term "actual killer." ECF No. 1 at 44. He asserts that the term has a technical definition, though he does not provide that definition. *See id*. He also does not explain what harm, if any, the failure to define the term caused. This claim is frivolous. As the Court of Appeal explained, the term "actual killer" is "self-explanatory and commonly understood meaning within the context of the instruction." *Travis*, 2015 WL 390361, at *13 n.6.

In sum, all instructional claims advanced by petitioner lack merit. The trial court correctly relied on pattern jury instructions routinely used in California courts, and those instructions did not relieve the government of its burden of proof. We cannot recommend habeas relief for any instructional error.

### c. Ineffective Assistance of Counsel (Claim 5)

Petitioner contends that he received ineffective assistance of counsel because his trial counsel failed to request jury instructions on two of the issues discussed above: (1) California's

16

escape rule and (2) proximate cause.  The Court of Appeal concluded that petitioner's trial counsel was not deficient and that the alleged deficiencies did not prejudice petitioner.

A "doubly" deferential standard governs a federal habeas petitioner's claim of ineffective assistance of counsel.  *See Richter*, 562 U.S. at 105.  On direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim.  *See* 466 U.S. 668, 687 (1984).  First, a criminal defendant must show some deficient performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."  *Id*.  Second, the defendant must show that the deficient performance caused him prejudice, which requires "showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial."  *Id*.  On habeas review, coupled with the fairminded jurist standard of Section 2254(d), the *Strickland* requirements become even more deferential: the question is "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Richter*, 562 U.S. at 105 (emphasis added).  That is, if there is even *one* reasonable argument that counsel did not violate the *Strickland* standard—even if the state court has not identified such argument—the petitioner cannot obtain habeas relief.  *See id*. at 106.

Here, a reasonable jurist could conclude that trial attorney's failure to request a jury instruction on California's escape rule did not satisfy the prejudice prong.  As discussed above, the collision's proximity to the crime scene, the stolen truck's high speed, and petitioner's decision to leave the victim after a serious collision strongly supported the finding that petitioner was fleeing from the crime scene.  In this factual context, a reasonable jurist could determine that plaintiff suffered no prejudice from the absence of an escape rule instruction.

As for the trial attorney's failure to request a jury instruction on proximate cause, a reasonable jurist could conclude that such failure did not satisfy the deficiency prong of the *Strickland* analysis.  The trial court's jury instructions adequately addressed the proximate cause element as discussed above, and a separate set of instructions on proximate cause principles was not required.

### d.  Insufficient Evidence (Claim 8)

The government charged petitioner with one count of leaving the scene of an accident

(Count 4), which required proof that petitioner was the driver of the stolen truck. *See* Cal. Veh. Code § 20001(a). The jury found that petitioner was the driver of the truck, and the same finding established that petitioner was the actual killer for the purposes of the robbery-murder special circumstance as part of his first-degree murder conviction (Count 1). CT 4:807, 811, 813. Petitioner argued on direct appeal that insufficient evidence supported the jury's finding that he was the driver, disputing eyewitness accounts and highlighting certain forensic evidence. The Court of Appeal rejected petitioner's claim, explaining that the fact that petitioner had demanded the keys to the truck during the robbery supported the jury's finding.

A criminal conviction unsupported by sufficient evidence can violate the Fourteenth Amendment's promise of due process, *see Jackson v. Virginia*, 443 U.S. 307, 317-18 (1979), but a habeas petitioner challenging the sufficiency of evidence must overcome "two layers of judicial deference," *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). Under *Jackson v. Virginia*, the appellate court on direct appeal decides "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). On habeas review, the AEDPA's deferential standard applies, and a federal court may "overturn a state court decision rejecting a sufficiency of the evidence challenge . . . only if the state court decision was 'objectively unreasonable'" under the AEDPA. *Coleman*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). "Because rational people can sometimes disagree, the inevitable consequence of [the AEDPA standard] is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos*, 565 U.S. at 2.

Here, a reasonable jurist could conclude that enough evidence supported the jury's finding that petitioner was the driver of the stolen truck. One of the two robbery victims, David Ruiz, identified petitioner as the person who had demanded and obtained the keys to his truck during the robbery. RT 3:654-58, 691-92; RT 5:1212. Ruiz testified that there were two robbers. RT 3:654. The DNA evidence from the stolen truck showed that there were two males in the vehicle. RT 4:1049. Stowers's DNA was found only on the passenger side of the truck; petitioner's DNA appeared on various parts of the vehicle, including on the driver's side's

18

exterior and interior. RT 4:1049-52. These facts supported a reasonable inference that petitioner was the driver of the stolen truck.[4]

Taking the opposite view, petitioner contends that insufficient evidence supported the jury's finding that he was the driver of the stolen truck, and raises six arguments: (1) no witness identified petitioner as the driver; (2) an eyewitness of the collision, Michael Harkness, initially told the police that the two men who exited the stolen truck were African Americans, but petitioner is Caucasian; (3) a bystander who did not testify at trial, Isaias Rodriguez, stated during a 911 call that the two men who exited the truck were African Americans; (4) the government failed to establish that there were only two passengers in the truck; (5) some of petitioner's blood was found on the passenger side of the truck; and (6) petitioner's blood on the driver's side of the truck does not show that he was the driver. *See* ECF No. 1 at 45-48.

The first three arguments warrant little discussion. First, the government was not required to offer eyewitness evidence that petitioner was the driver. *See People v. Brooks*, 3 Cal. 5th 1, 57 (2017) ("Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence."). Second, Harkness testified at trial that, contrary to what the police report stated, he never told the police that the passengers were African Americans. RT 3:643. The jury could find Harkness's testimony credible. *See United States v. Preston*, 873 F.3d 829, 836 (9th Cir. 2017) ("[I]t is emphatically the province and duty of the jury to determine . . . the weight and the credibility of the testimony of the witnesses." (internal citation and alterations omitted)). Third, the jury could likewise reject Rodriguez's out-of-court statement made during a 911 call—even assuming that it was admissible. *See id*. Indeed, petitioner does not dispute that the two robbers wore black clothing and partially covered their faces. *See* RT 3:634, 720. The absence of direct evidence and the witnesses' alleged mistake as to petitioner's ethnicity did not preclude the jury's finding that petitioner was the driver.

---

[4] Stowers informed the police during an interview that petitioner was driving the stolen truck. *Travis*, 2015 WL 390361, at *3 n.3. Because this statement was excluded, we do not consider it here.

We also reject petitioner's fourth argument that the government failed to prove that the stolen truck had only two passengers. The government's theory did not rely on the truck having only two passengers: the fact that petitioner had demanded the keys to the truck before fleeing the crime scene supported the finding that he was the driver. In any event, we address petitioner's theory that there were three passengers. According to petitioner, the actual driver of the truck— an unidentified individual who successfully evaded arrest—picked up petitioner when he was walking down the street. Petitioner was sitting in the back seat of the truck, and the collision launched him toward the front of the truck, where he hit the windshield. He and the other two passengers exited the truck through the driver's-side window, leaving petitioner's blood on the driver's side. Petitioner contends that because the third passenger was the actual driver of the truck, petitioner was not the actual killer of the deceased victim.

The jury had enough evidence to conclude that the truck had only two passengers. To show that there was a third passenger, petitioner adduced at trial no evidence other than his own testimony. RT 7:1851-53. Although the jury could credit petitioner's testimony, the government's evidence showed otherwise. Harkness testified that there were only two men exiting the vehicle. RT 3:631-32. No forensic evidence revealed that there was a third passenger. *Cf.* RT 4:1049 ("[Scott Lewis, DNA expert]: Those – the two profiles from the two samples from each side of the vehicle were consistent with each other, but they were from two different males."). Because Stowers's DNA did not appear on the driver's side, the jury could infer, by the process of elimination, that petitioner was the driver.

As for the fifth issue, petitioner contends that his blood found on the windshield slightly to the right side of the rearview mirror supports his theory that he was sitting in the backseat and then thrown toward the front, hitting the windshield during the collision. Petitioner's blood on the passenger side, however, is also consistent with petitioner being the driver: Mark Whelchel, an expert witness on automobile collisions and a mechanical engineer, testified that the forward momentum during the collision was slightly toward the passenger side. RT 6:1636, 1644, 1660. The forward momentum that threw the passengers and objects slightly toward the passenger side explained petitioner's blood on the windshield on the passenger side.

Finally, petitioner contends that his blood found on the driver side of the truck does not show that he was the driver. Petitioner relies on the testimony of Detective Brian Hance, who has opined that the passengers of the truck exited the truck through the driver's-side door. ECF No. 1 at 47. Detective Hance's opinion supports, but does not conclusively prove, petitioner's theory that he was merely a passenger who exited through the driver side. Detective Hance based his opinion on his observations of the truck after the collision; he did not witness the collision first-hand. Harkness, on the other hand, witnessed the collision and testified that the driver exited the truck from the driver's side and the other individual exited on the passenger side. RT 3:632. The jury could credit Harkness's eyewitness account. The Court of Appeal reasonably rejected petitioner's claim of insufficient evidence.

**e. Verdict Form**

The verdict form used at trial prompted the jury to decide whether the government had "proved" or "not proved" the robbery-murder special circumstance. CT 4:807. Petitioner did not object to this wording at trial, but he argued for the first time on appeal that the jury should have been asked whether the special circumstance allegation was "true" or "not true." He argued that the lack of an express "true" finding on the verdict form constituted a defect invalidating his sentence of life without the possibility of parole. The Court of Appeal rejected petitioner's claim as frivolous. In this habeas proceeding, petitioner repeats the same argument. He says:

> Here, the verdict form did not require the jury to determine whether the special circumstance allegation was true. Instead, it required the jury to determine whether it was "proved." The jury returned a verdict on the special circumstance of "proved." (4 CT 807.) "Truth" is a higher standard than "proof." Truth is infallible, it is always true; proof is not. Proof is the means by which humans attempt to discover or establish the truth, but proof is not the same as truth itself. It is only an approximation of the truth. Proof can change when new information is discovered, but truth is constant and unchangeable. Inherent in the concept of proof is the possibility that the proof can be wrong and that the truth may be otherwise. An untrue allegation can be proved, but it can never be true.

ECF No. 1 at 49. The argument is creative, but the semantic distinction between truth and proof is insignificant. The jury's job was to evaluate whether the government met its burden of proof—and in that context the court could hardly have erred in asking the jury whether the special

circumstance had been "proved." The Court of Appeal reasonably rejected this claim. No other claim remains, and we recommend that the court deny the petition in its entirety.

### III. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, the court should decline to issue a certificate of appealability.

### IV. Findings and Recommendations

We recommend that the court deny the petition and decline to issue a certificate of appealability. Under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California, we submit the findings and recommendations to the U.S. District Court Judge presiding over the case. Within fourteen days of the service of the findings and recommendations, any party may file written objections to the findings and recommendations. That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations." The presiding District Judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:    August 5, 2019

UNITED STATES MAGISTRATE JUDGE

No. 202